UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

                 :

DOVER BARGE COMPANY, SIMMS HUGO
NEU and HUGO NEU SCHNITSER EAST  :
COMPANY,

                 :

        Plaintiffs,

                 :

    - against -

                 :

TUG "CROW," her engines, boilers
etc., and PORT ALBANY VENTURES,  :
LLC,

                 :

        Defendants.

- - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-30-09

**OPINION**

06 Civ. 15495 (DC)

**APPEARANCES:**      GRAHAM, MILLER, NEANDROSS,
                      MULLIN & ROONAN, LLC
                      Attorneys for Plaintiffs
                          By:  Jeffery L. Neandross, Esq.
                      2350 Broadway - Suite 215A
                      New York, New York  10024

                      NICOLETTI HORNIG & SWEENEY, LLP
                      Attorneys for Defendants
                          By:  Terry L. Stoltz, Esq.
                      88 Pine Street, 7th Floor
                      New York, New York  10005

**CHIN, District Judge**

        On December 30, 2005, the barge HNSE 105 (the "Barge"),

owned by plaintiffs Dover Barge Company ("Dover"), Simms Hugo Neu

("Simms"), and Hugo Neu Schnitzer East ("HNSE"), flooded and sank

in the Hudson River while being towed by the tugboat Crow (the

"Tug"), which was owned by defendant Port Albany Ventures, LLC

("PAV").  In this maritime negligence case, plaintiffs seek

damages, alleging that the negligence of the crew of the Tug

caused the Barge to sink.  Plaintiffs also attempt to invoke the
Pennsylvania Rule, arguing that the burden of proof should shift
to PAV based on PAV's violation of a maritime rule.

PAV moves for summary judgment as to plaintiffs'
maritime negligence claim.  Alternatively, it moves for partial
summary judgment to limit its liability under the Limitation of
Liability Act (the "Act"), 46 U.S.C. §§ 30501-30512.

For the reasons set forth below, I conclude that
genuine issues of material fact exist that preclude the entry of
summary judgment.

**BACKGROUND**

**A.  Facts**

On this motion for summary judgment, the Court
construes the facts in the light most favorable to plaintiffs, as
the non-moving party.  The following facts are drawn from the
deposition transcripts, affidavits, declarations, and exhibits:

**1.  The Parties**

PAV operates a marine terminal in Albany, New York.  It
has a contract with plaintiffs for temporary storage of scrap
steel that is loaded by PAV onto barges provided by plaintiffs.[1]

---

[1]     Plaintiffs insured the Barge and its cargo under
policies issued by Fireman's Insurance Corp.  Plaintiffs in this
case are nominal plaintiffs, as the real party in interest is
Fireman's Fund Insurance Corp., which seeks to recover its policy
payments in subrogation.

(Chace Dep. at 6).  Plaintiffs' barges are towed by PAV from Port
Albany to plaintiffs' Claremont Terminal facility in the Port of
New York and New Jersey.  (Id. at 6, 8).

## 2.  The Sinking of the Barge

On December 30, 2005, the Barge sank in the Hudson
River while being towed by the Tug.

The Barge, previously a New York City Sanitation
garbage scow -- a vessel that has a flat bottom and sloping sides
-- is owned by Inland Barge Corporation, and was chartered to
Dover at the time of the sinking.  (Id. at 10).  The Barge is an
open cargo hopper barge, meaning it has a large open container at
its center.  (Id. at 12).  Its sloped sides -- called "rakes" --
allow it to be towed from either end.  (Id. at 11).  Between the
rakes the Barge is designed to have four watertight main
compartments which are next to one another underneath the deck,
within the hull of the ship.  (10/29/06 Farrell Report).  The
first of these compartments is the rake compartment, second is
compartment No. 1, third is compartment No. 2, and fourth is
compartment No. 3.  (10/29/06 Farrell Report).  These
compartments are separated by upright walls, called "bulkheads."
(10/29/06 Farrell Report).

The Barge was loaded with scrap metal in the Port of
Albany on December 27, 2005.  (Chace Dep. at 9-10).  It remained

- 3 -

at the Port of Albany until December 29, 2005, while a second
barge for the voyage, Barge DB40, was being loaded. (Curley Dep.
at 7). On December 29, 2005, Captain Curley, First Mate Johnson,
engineer Pedrosa, and deck-hand Nuno Pedrosa manned the Tug.
(Johnson Dep. at 20-21). Curley has been employed as a tugboat
captain by PAV since 2003. (Curley Aff. ¶ 1). He has a 1600-ton
master license and an unlimited master of towing license issued
by the United States Coast Guard. (Id.). At the time of the
accident, Curley had been captain of the Tug for approximately
three to six months. (Id.). He had towed barges up and down the
Hudson River between Albany and Jersey City twenty-four times.
(Id.). Johnson has periodically worked for PAV since 2001.
(Johnson Dep. at 6). Neither has received any warnings,
restrictions, or suspensions with regard to any Coast Guard
licenses. (Id.; Curley Aff. ¶ 3).

        Before departing from Albany on December 29, 2005,
Curley had his crew inspect the hatches aboard the Barge to
ensure that they were closed and that those hatches that could be
were in fact secured. (Curley Aff. ¶ 5). The Tug's crew
reported no defects with the Barge prior to departure from
Albany. (Curley Dep. at 15). The Tug commenced towing the two
barges at 5:30 p.m. on December 29, 2005. (Id. at 7). The crew
did not observe any conditions that would indicate problems with

- 4 -

the Barge.  (Id. at 15).  Curley reported the Barge was floating
normally for a fully loaded barge of its type and that the wash
-- or water splashing on to the deck -- was normal.  (Curley Aff.
¶ 10).

          At approximately 12:45 a.m. Curley turned over the
watch to Johnson.  (Curley Dep. at 7).  The engineer, Pedrosa,
was stationed in the pilothouse with Johnson and was acting as a
look-out.  (Johnson Dep. at 21-22).  The Barge was illuminated
with Coast Guard approved navigational lights, but not
floodlights, though they were also available.  (Johnson Dep. at
23).  At approximately 2:30 a.m. on December 30, Johnson noticed
that the Barge was riding low at the bow, the forwardmost point
of the ship.  (Id. at 36).  Pedrosa notified Curley that the
Barge might be taking on water.  (Curley Dep. at 7).  Curley
observed that the water level was above the forward deck of the
Barge.  (Id. at 7, 11).  Curley separated the Tug from the Barge
and moved it next to the Barge.  (Id. at 38).

          Johnson and another crew member boarded the Barge,
opened the rake hatch cover and found the rake compartment
flooded.  (Johnson Dep. at 38-40).  Johnson did not see any
indication that the deck wash had flipped open the foredeck hatch
cover.  (Id.).  For fifteen minutes the crew unsuccessfully
attempted to use a two-inch gasoline pump to pump water out of

the rake compartment.  (Id.; Curley Dep. at 8-9).  They then
attempted to de-water compartment No. 1.  (Curley Dep. at 13).
Despite their efforts, the flooding increased.  (Curley Dep. at
7-8, 10, 13).  Subsequently, compartment No. 1 and No. 2, which
are adjacent to the rake compartment, also flooded.  (Id. at 13).
Attempts to move the Barge into shallow water were unsuccessful.
(Id. at 8-9, 13).  The crew detached the gate lines, which
connected the Tug and the Barge, and stowed the still-intact
lines inside the Barge. (Curley Aff. ¶ 14).  The Barge sank
completely by 4:45 a.m. on December 30, 2005.  (Curley Dep. at 8-
9).

Salvage operations to recover the Barge and its cargo
commenced on March 4, 2006.  (10/29/06 Farrell Report at 8).  On
April 9, 2006, after some delays, the Barge was successfully
raised and de-watered.  (Id. at 9).  A survey conducted after the
Barge was salvaged revealed that the deck and rake hatches were
damaged and that there was no significant damage below the level
of the deck.  (Fahlbusch Dep. at 47-48, 58).  A vent pipe was
damaged and detached from the deck.  (10/29/06 Farrell Report at
9).

**B.  Procedural History**

Plaintiffs commenced this lawsuit on December 27, 2006,
alleging that their Barge sank due to the unseaworthiness of the

- 6 -

Tug and the negligence of her crew.  Plaintiffs claim $644,536.90 in damages, representing the costs of the salvage operation to retrieve the Barge and her cargo and repairs to the Barge.

On Febuary 27, 2007, PAV filed an Answer to plaintiffs' Complaint, asserting limitation of liability as an affirmative defense.  PAV also brings a counterclaim against plaintiffs for the stevedoring and storage services rendered by it in connection with both barges towed, in the amount of $30,330.89.

Discovery commenced, and this motion followed.

## DISCUSSION

PAV moves for summary judgment dismissing the complaint.  Alternatively, it moves for partial summary judgment striking PAV's limitation of liability defense.

Because genuine issues of material fact exist, PAV's motion is denied, in both respects.

## A.   PAV's Motion for Summary Judgment on the Maritime Negligence Claim

First, I set out the applicable law regarding summary judgment and maritime negligence.  Second, I address PAV's motion.  I conclude that summary judgment is inappropriate because there are genuine issues of material fact that must be decided by a jury.

### 1. **Applicable Legal Standards**

#### a. **Summary Judgment Standard**

The standards governing motions for summary judgment
are well-settled.  A court may grant summary judgment only where
there is no genuine issue of material fact and the moving party
is therefore entitled to judgment as a matter of law.  See Fed R.
Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 585-87 (1986).  Summary judgment should be
denied "if the evidence is such that a reasonable jury could
return a verdict" in favor of the non-moving party.  See NetJets
Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d
Cir. 2008).  In deciding a motion for summary judgment, the Court
must construe the evidence in the light most favorable to the
non-moving party and draw all reasonable inferences in the non-
moving party's favor.  In re "Agent Orange" Prod. Liab. Litig.,
517 F.3d 76, 87 (2d Cir. 2008).  The non-moving party cannot,
however, "escape summary judgment merely by vaguely asserting the
existence of some unspecified disputed material facts, or defeat
the motion through mere speculation or conjecture."  W. World
Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)
(internal citations and quotations omitted).

In deciding a motion for summary judgment, the role of
the Court is not to ask whether "the evidence unmistakably favors

one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  Because the Court's role is limited in this respect, it may not make factual findings, determine credibility of witnesses, or weigh evidence. <u>See</u> <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d Cir. 2005); <u>Hayes v. New York City Dep't of Corr.</u>, 84 F.3d 614, 619 (2d Cir. 1996); <u>United States v. Rem</u>, 38 F.3d 634, 644 (2d Cir. 1994).

### b.  <u>Maritime Negligence Standard</u>

Plaintiffs' claim is for maritime negligence.  To prevail, they must show that:  (1) the Tug's crew was negligent; and (2) the negligence was the proximate cause of the injury. <u>Topor-Taparek v. Socony Mobil Oil Co.</u>, 339 F.2d 792, 794 (2d Cir. 1964).

"Towage is not a bailment and the tug is not an insurer.  The burden of proving negligence rests upon the tow." <u>Geo. W. Rogers Const. Corp. v. Tug Ocean King</u>, 252 F. Supp. 657, 665 (S.D.N.Y. 1965) (citing <u>Stevens v. White City</u>, 285 U.S. 195 (1932)).  To establish a prima facie case plaintiffs must present evidence such that the "time, place and cause of the injury" are not left in the "realm of conjecture."  <u>Elizabeth Turner, Inc. v. Tug Lucky D</u>, 941 F. Supp. 439, 443-44 (S.D.N.Y. 1996) (citing

Stevens, 285 U.S. at 203-04).  When negligence can be presumed, however, then the burden is on PAV to rebut the prima facie case or present a reasonable excuse other than its own negligence. Id.

### c.  **Inland Rule 5**

Inland Rule 5, known as the Look-out Rule, requires that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."  33 U.S.C. § 2005.[2]  The Look-out Rule applies to tugboats.  Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151, 1159 (2d Cir. 1978) (citation omitted).

### 2.  **Application**

Here, genuine issues of material fact exist for trial. The parties agree that the Barge sank because water entered the boat through some portion of the deck and then entered the forward rake compartment.  (10/29/06 Farrel Report at 13; Van Hemmen Report at 42-45; Parmelee Aff. ¶ 5).  They disagree, however, on the following material facts:

---

[2]     Congress has passed a set of rules, referred to as the Inland Rules, governing "all vessels upon the inland waters of the United States."  33 U.S.C. § 2001 (Rule 1).  These rules are codified at 33 U.S.C. § 2001 et seq.

First, the length of the tow lines used to tow the Barge on December 29, 2005 is in dispute.  When tow lines are too short they can cause water to rise behind the tug as a result of its forward movement -- called "wake" -- and water that rises behind the tug as a result of propellor movement -- called "propeller wash" -- to splash onto the deck of the barge. (Parmelee Aff. ¶5).  If such water accumulates it is possible for excess water to enter into the hull through openings on the deck.

The lines surveyed after the Barge was salvaged were sixty-seven to sixty-nine feet in length.  (<u>Id.</u>).  PAV asserts that the lines employed for towing the Tug on December 29, 2005 were longer, one-hundred and fifty to one-hundred and seventy-five feet, and of adequate length for the towage.  (Curley Dep. at 17-18).  The post-salvage inspection of the lines shows that they were cut, PAV claims, because the original lines had twenty-three feet of wire rope attached to the end and also metal loops, both of which were missing from the surveyed lines.  (Farrell Aff. ¶¶ 1-2; Curley Reply Aff. ¶ 3).

Plaintiffs argue that because the lines were reported to be "stil intact" when stowed on the Barge before it sank the lines surveyed were the same as those used during towage and thus too short.  (Curley Aff. ¶ 14; Parmelee Aff. ¶¶ 5-6).  They blame short tow lines for causing water to accumulate on the barge and

ultimately flood into the rake compartment.  (Parmelee Aff. ¶ 5).
Whether the lines were originally short or cut after salvage is a
question of fact for the jury, however, as both sides have
submitted evidence to support their assertions in this respect.

  Second, there is a dispute as to whether the crew
maintained a proper look-out aboard the Tug.  The engineer,
Pedrosa, was stationed in the pilothouse of the Tug with Johnson
and was acting as a look-out.  At the time the Barge was
illuminated with Coast Guard approved navigational lights, but
not floodlights, though there were also available.  Plaintiffs
argue that Pedrosa should have used floodlights to observe the
Barge and because he did not he was in violation of Inland Rule
5.  Pedrosa was required to use "all available means appropriate
under the prevailing circumstances . . . so as to make a full
appraisal of the situation," 33 U.S.C. § 2005, and whether he
should have turned on the floodlights is a question for the jury.
Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369
U.S. 355, 360 (1962) (negligence question for jury).

  PAV argues that these factual disputes are irrelevant
because the leaking bulkheads of the Barge was the proximate
cause of it sinking.  This pre-existing bulkhead damage, PAV
claims, permitted water from the flooded rake compartment to flow
into the No. 1 and No. 2 main compartments, causing the barge to

- 12 -

bend toward its back and submerge.  (Farrel Report 10/29/06; van Hemmen Report at 6-7).  Whether the leaky bulkheads were the proximate cause of the sinking is a disputed issue.

Even if the bulkhead leakage was pre-existing -- a conclusion plaintiffs' expert does not appear to contest -- PAV is not entitled to summary judgment.  The issues of tow line length and negligence of the look-out are material and must be decided by a jury.  In <u>Geo. W. Rogers Const. Corp. v. Tug Ocean King</u>, the court noted that if the excessive speed of a tug caused its tow to become awash with unnatural amounts of water, permeating the tow's leaky deck into its hull and causing flooding and capsizing, the tow would not be considered unseaworthy.  252 F. Supp. 657, 663 n.1 (S.D.N.Y. 1965).  The standard applied to the condition of the tow was "reasonable fitness for intended use."  <u>Id.</u>  The vessel could not be deemed unseaworthy for having a leaky deck because there was an unreasonable amount of wash upon the deck.  <u>Id.</u>  Similarly, here, if the tow lines were too short, it is possible that an unnatural amount of water accumulated on the deck of the Barge.  If this is true then the leaky bulkheads alone cannot be blamed for the sinking of the Barge.

## B.  **The Pennsylvania Rule**

### 1. **Applicable Legal Standard**

The Pennsylvania Rule is named after the Supreme Court

case The Pennsylvania, 86 U.S. 125, 136 (1874), in which the

Court held:

> But when . . . a ship at the time of
> collision is in actual violation of a
> statutory rule intended to prevent
> collisions, it is no more than a reasonable
> presumption that the fault, if not the sole
> cause, was at least a contributory cause of
> the disaster.  In such a case the burden
> rests upon the ship of showing not merely
> that her fault might not have been one of the
> causes, or that it probably was not, but that
> it could not have been.  Such a rule is
> necessary to enforce obedience to the mandate
> of the statute.

The Pennsylvania Rule, in other words, shifts to

defendants the burden of disproving causation.  The Pennsylvania

Rule originally applied only to cases involving collisions

between ships, but has been extended to apply to any statutory

violator who is a party to a maritime accident.  Complaint of

Nautilus Motor Tanker Co., Ltd., 85 F.3d 105, 113-14 (3d Cir.

1996) (citing Pennzoil Producing Co. v. Offshore Express, Inc.,

943 F.2d 1465, 1471 (5th Cir. 1991)).  Because the Pennsylvania

Rule places a heavy burden on defendants, it is "limited to the

violation of a statute intended to prevent the catastrophe which

actually transpired." Dir. Gen. of India Supply Mission v. S.S. Maru, 459 F.2d 1370, 1375 (2d Cir. 1972); accord Wills v. Amerada Hess Corp., 379 F.3d 32, 43 (2d Cir. 2004); Elizabeth Turner, Inc. v. Tug Lucky D, 941 F. Supp. 439, 442 (S.D.N.Y. 1996). The Pennsylvania Rule will not create a presumption that the violation caused an injury unless "common sense or the realities of admiralty prompt that conclusion." Wills v. Amerada Hess Corp., 379 F.3d 32, 43 (2d Cir 2004); accord The Mabel, 35 F.2d 731, 732 (2d Cir. 1929) (refusing to impose Pennsylvania Rule against anchored ship because court found it improbable that ship's failure to hang cautionary lights, required by law, was cause of collision).

Three elements must exist for the Pennsylvania Rule to apply: (1) proof by a preponderance of the evidence of a violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent. 2 Thomas J. Schoenbaum, The Law of Admiralty § 14-3, at 102 (4th ed. 2004). Failure to post a look-out when the conditions require one has been found to warrant invocation of the Pennsylvania Rule. Tug Ocean Prince, 584 F.2d at 1159-60.

## 2. **Application**

Plaintiffs attempt to invoke the Pennsylvania Rule based on PAV's alleged violation of Inland Rule 5. Here, however, the engineer, Pedrosa, was acting as a look-out aboard the Tug at the time of the accident. Plaintiffs thus have the burden of showing that Pedrosa violated Inland Rule 5.

Plaintiffs argue Pedrosa was an inadequate lookout and violated Inland Rule 5 for the reasons stated above. Whether the means of observation used by Pedrosa -- specifically the use of navigational lights only, without floodlights -- were inappropriate "in the prevailing circumstances," 33 U.S.C. § 2005, is an issue of fact. If the jury finds a violation, the burden would shift to PAV to disprove causation. Accordingly, the motion for summary judgment is denied in this respect because whether the Pennsylvania Rule applies turns on the jury's findings.

## C. **PAV's Motion for Partial Summary Judgment Under the Act**

PAV moves for partial summary judgment pursuant to the Act. It argues that its liability should be limited to $150,000.00, the estimated value of the Tug.

## 1. **Applicable Legal Standards**

The Act "allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or

knowledge, to the value of the vessel or the owner's interest in the vessel." <u>Lewis v. Lewis & Clark Marine, Inc.</u>, 531 U.S. 438, 439 (2001) (citing 46 App. U.S.C. § 183(a)).  The owner has a duty to provide a competent captain and crew and a seaworthy ship.  <u>Tug Ocean Prince</u>, 584 F.2d at 1155 (citing <u>Teeracciano v. McAlinden Constr. Co.</u>, 485 F.2d 304 (2d Cir. 1973)).  If the owner provides an unseaworthy ship, the Act does not apply.

> Seaworthiness is a relative term depending
> upon its application to the type of vessel
> and the nature of the voyage.  The general
> rule is that the vessel must be staunch,
> strong, well equipped for the intended voyage
> and manned by a competent and skillful master
> of sound judgment and discretion.

<u>Id.</u> at 1155 (citations omitted).

The Supreme Court has held that a ship can be deemed unseaworthy for many reasons, including defective gear, appurtenances in disrepair, or an unfit crew.  <u>Usner v. Luckenbach Overseas Corp.</u>, 400 U.S. 494, 499 (1971).  A shipowner may not limit his liability under the Act if the ship is unseaworthy due to equipment which was defective at the start of the voyage.  <u>Villers Seafood Co., Inc. v. Vest</u>, 813 F.2d 339, 343 (11th Cir. 1987).  The owner is charged with knowledge of the existence of that condition.  <u>Id.</u>  A single act of operational negligence, however, will not suffice to create an unseaworthy condition.  Operational negligence must be "pervasive or repeated

- 17 -

frequently for it to rise to the level of an unseaworthy condition." Fed. Ins. Co. v. PGG Realty, LLC, 538 F. Supp. 2d 680, 697 (S.D.N.Y. 2008) (internal citation and quotations omitted).

## 2.  **Application**

Plaintiffs argue that the Tug was unseaworthy because there was an improper look-out, an inadequate pump and the tow lines were too short.  I address each of these issues in turn.[3]

First, for a look-out's negligence to render the Tug unseaworthy it would have to be either "pervasive" or repeated frequently.  PGG Realty, 538 F. Supp. 2d at 697-98.  Plaintiffs argue that Pedrosa was an inadequate look-out because he failed to employ all available means to observe the Barge.  Plaintiffs have not demonstrated, however, that Pedrosa's negligent acts were pervasive or repeated frequently.  Plaintiffs have submitted no evidence of prior negligence by the look-out nor shown that Pedrosas's negligent acts "suffice to create an unseaworthy condition."  Id.  I thus reject this argument as a matter of law.

Second, plaintiffs argue that the pump employed by the crew was inadequate and that a larger pump should have been used

---

[3]     Plaintiffs also argue PAV's attempt to limit its liability under the Act is time-barred.  As I deny PAV's motion, I do not consider this argument.

or available to pump water out of the flooded compartments.   The

crew had unsuccessfully attempted to use a two-inch gasoline pump

to pump water out of the rake compartment and compartment No. 1.

This two-inch pump has a capacity of approximately fifty to one-

hundred gallons per minute.   (Van Hemmen Dep. at 28, 65).   The

forward rake compartment, fully flooded, held about twenty-two

thousand gallons of water by itself, and compartments No. 1 and

No. 2 were also flooded.   (Van Hemmen Dep. at 64; Parmelee Dep.

at 48).   A reasonable jury could find that it would have taken

hours to pump out the water with this pump.   Whether the pump

available and used by the crew was adequate is a question of fact

for the jury.

Third, plaintiffs contend that the Tug was unseaworthy

because her tow lines were too short.   If the jury finds the tow

lines supplied by PAV were too short, it could also find that

therefore the Tug was unseaworthy.   A condition of

unseaworthiness would preclude PAV from invoking the Act.   Thus,

summary judgment is inappropriate.   At trial PAV may renew its

argument that the Act should apply.

## **CONCLUSION**

For the foregoing reasons PAV's motions are denied.

The parties shall appear in Courtroom 11A on August 14, 2009 at

11:00 a.m. to set a date for trial.

SO ORDERED.

Dated:    New York, New York
          July 30, 2009

DENNY CHIN
United States District Judge

- 20 -